**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

**IN RE:**

**CHERYL R. BATES,** **CASE NO. 09-51279-NPO**

**DEBTOR.** **CHAPTER 7**

**HANCOCK BANK** **PLAINTIFF**

**V.** **ADV. PROC. NO. 09-05092-NPO**

**CHERYL R. BATES AND**
**CHARLES R. BATES,**
**A/K/A CHUCK BATES,**
**D/B/A CHUCK BATES WHOLESALE** **DEFENDANTS**

**CHERYL R. BATES** **COUNTER-PLAINTIFF**

**V.**

**HANCOCK BANK** **COUNTER-DEFENDANT**

**CHERYL R. BATES** **THIRD-PARTY PLAINTIFF**

**V.**

**CLAY LEYSER AND GERALD**
**CALHOUN GEX, JR., AS AGENTS AND**
**EMPLOYEES OF HANCOCK BANK** **THIRD-PARTY DEFENDANTS**

**MEMORANDUM OPINION ON RULE 7056 MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CHERYL R. BATES, RULE 7056 MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CHARLES R. BATES, AND MOTION TO DISMISS COUNTERCLAIM AND THIRD-PARTY COMPLAINT**

There came on for consideration the Rule 7056 Motion for Partial Summary Judgment as to Cheryl R. Bates ("Rule 7056 Motion Against Debtor") (Adv. Dkt. No. 23) filed by Hancock Bank;

the Rule 7056 Motion for Partial Summary Judgment as to Charles R. Bates ("Rule 7056 Motion Against Bates") (Adv. Dkt. No. 26) filed by Hancock Bank; and the Motion to Dismiss Counterclaim and Third-Party Complaint ("Motion to Dismiss") (Adv. Dkt. No. 21) filed by Hancock Bank, Clay Leyser ("Leyser") and Gerald Calhoun Gex, Jr. ("Gex") in the above-referenced adversary proceeding (the "Adversary"). Hancock Bank initiated this Adversary to recover the balance due on a promissory note bearing the forged signature of the Debtor, Cheryl R. Bates (the "Debtor"). Charles R. Bates ("Bates"), the Debtor's husband, forged her name on loan documents in order to obtain funds for his business. If granted, the Rule 7056 Motion Against Debtor and the Rule 7056 Motion Against Bates would result in a judgment in favor of Hancock Bank and against the Debtor and Bates in the amount of $16,152.24, not including interest and attorney's fees. The Motion to Dismiss, if granted, would result in the dismissal of all counterclaims alleged by the Debtor against Hancock Bank, Leyser, and Gex.

Other pleadings submitted by the parties in support of their respective positions include: (1) Itemization of Facts Relied Upon and Not Genuinely Disputed in Support of Rule 7056 Motion for Partial Summary Judgment as to Cheryl R. Bates (Adv. Dkt. No. 24) filed by Hancock Bank; Memorandum in Support of Hancock Bank's Rule 7056 Motion for Partial Summary Judgment as to Cheryl R. Bates (the "Brief in Support of Rule 7056 Motion Against Debtor") (Adv. Dkt. No. 25) filed by Hancock Bank; Defendant, Cheryl R. Bates' Response to Hancock Bank's Rule 7056 Motion for Partial Summary Judgment as to Cheryl R. Bates (Adv. Dkt. No. 38) filed by the Debtor; Defendant, Cheryl R. Bates' Response to Hancock Bank's Itemization of Facts Relied Upon and Not Genuinly [sic] Disputed in Support of Rule 7056 Motion for Partial Summary Judgment as to Cheryl R. Bates (Adv. Dkt. No. 39) filed by the Debtor; Defendant, Cheryl R. Bates' Itemization of Facts

Relied Upon and Not Genuinly [sic] Disputed in Opposition to Rule 7056 Motion for Partial Summary Judgment as to Cheryl R. Bates (Adv. Dkt. No. 40) filed by the Debtor; Defendant, Cheryl R. Bates' Memorandum in Opposition to Hancock Bank's Rule 7056 Motion for Partial Summary Judgment as to Cheryl R. Bates (Adv. Dkt. No. 41) filed by the Debtor; (2) Itemization of Facts Relied Upon and Not Genuinely Disputed in Support of Rule 7056 Motion for Partial Summary Judgment as to Charles R. Bates (Adv. Dkt. No. 27) filed by Hancock Bank; Memorandum in Support of Hancock Bank's Rule 7056 Motion for Summary Judgment as to Charles R. Bates (the "Brief in Support of Rule 7056 Motion Against Bates") (Adv. Dkt. No. 28) filed by Hancock Bank; Response of Charles R. Bates to the Motion for Partial Summary Judgment of Hancock Bank (the "Bates Response to Rule 7056 Motion Against Bates") (Adv. Dkt. No. 36) filed by Bates; Response of Charles R. Bates to Itemizations of Factual Relief [sic] not Genuinely Disputed (Adv. Dkt. No. 37) filed by Bates; (3) Memorandum in Support of Motion to Dismiss Counterclaim and Third-Party Complaint (Adv. Dkt. No. 22) filed by Hancock Bank, Leyser, and Gex; Defendant, Cheryl R. Bates' Response to the Motion to Dismiss Counterclaim and Third-Party Complaint (Adv. Dkt. No. 34) filed by the Debtor; and Defendant Cheryl R. Bates' Memorandum in Opposition to the Motion to Dismiss Counterclaim and Third-Party Complaint (the "Debtor Brief in Opposition to Motion to Dismiss") (Adv. Dkt. No. 35) filed by the Debtor.

At the hearing held on March 4, 2010, Derek A. Henderson represented Hancock Bank, Leyser, and Gex; David L. Lord represented the Debtor; and Fredrick B. Feeney, II represented Bates. Having reviewed the above-referenced pleadings and all the exhibits attached thereto, together with other pleadings on file and the briefs submitted by the parties, the Court finds for the reasons set forth below that Hancock Bank is not entitled to summary judgment as a matter of law on its contract claim against the Debtor but is entitled to summary judgment as a matter of law on

its conversion claim against Bates in an amount to be determined later at trial. The Court further finds that Hancock Bank, Gex, and Leyser are entitled to judgment as a matter of law on the Debtor's claims for (1) breach of fiduciary duty; (2) negligence *per se* based on violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq*.; (3) negligent misrepresentation and fraud; and (4) civil conspiracy. Finally, the Court finds that Hancock Bank, Gex, and Leyser are not entitled to judgment as a matter of law on the Debtor's claims for negligence *per se* based on violations of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. §§ 6801 *et seq*. or for conversion.[1]

**Jurisdiction**

This Court has jurisdiction over the subject matter of and the parties to this proceeding. This matter is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(B). Notice of the motions was proper under the circumstances.

**Facts**

In making its determination of facts on the Rule 7056 Motion Against Debtor and the Rule 7056 Motion against Bates, this Court must view the evidence submitted by the parties in the light most favorable to the non-moving party. McPherson v. Rankin, 736 F.2d 175, 178 (5th Cir. 1984). With that standard in mind, the Court finds that there are no genuine issues with respect to the following material facts:

1. In February or early March, 2007, Bates asked the Debtor to co-sign a loan for him, and she refused. (Debtor Exam. at 34-35, Adv. Dkt. No. 22).[2]

---

[1] The following constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

[2] Hancock Bank did not submit signed or certified copies of the transcripts of the Debtor's testimony upon which it relies. Neither the Debtor nor Bates, however, objected to the authenticity of Hancock Bank's summary judgment evidence, and there is no indication in the

2. Sometime in early 2007, Bates contacted Hancock Bank requesting a $35,000 loan, purportedly on behalf of the Debtor. (Debtor Exam. at 24-25, Adv. Dkt. No. 22; Garcia Exam. at 9-10, Adv. Dkt. No. 40).

3. On March 6, 2007, Erin Garcia (formerly Erin Yarborough) ("Garcia"), an employee of Hancock Bank, completed a telephone application for a loan of money to Debtor in the amount of $35,000. (Garcia Exam. at 9-10 & Ex. 1, Adv. Dkt. No. 40).

4. Garcia did not meet with the Debtor or speak with her at any time during the loan process. (Garcia Exam. at 9-10, Adv. Dkt. No. 40). Leyser, the Western Division Manager at Hancock Bank and Garcia's immediate supervisor, provided Garcia with the information necessary to process the Debtor's telephone application. (Leyser Exam. at 7, Garcia Exam. at 8-9, Adv. Dkt. No. 40). Leyser and Bates have known each other for many years. (Leyser Exam. at 14, Adv. Dkt. No. 35).

5. On or about March 7, 2007, Gex, a loan review manager at Hancock Bank, observed Leyser and Bates talking together at Hancock Bank's branch in Bay St. Louis. (Gex Exam. at 7, 11, Adv. Dkt. No. 40). Gex had previously worked for Bates, and they were friends. (Gex. Exam. at 13-14, 16, Adv. Dkt. No. 40). Leyser asked Gex to deliver the promissory note and other loan documents personally to the Debtor at her home in Pass Christian. (Gex Exam. at 11, Adv. Dkt. No. 40). Gex delivered the note and other loan documents to the Debtor's home, but left them there with Bates instead of the Debtor.[3] (Gex. Exam. at 11, 13, Adv. Dkt. No. 40).

---

record that the transcripts are inaccurate. See United States v. "Monkey", 725 F.2d 1007, 1011 n.4 (5th Cir. 1984) (objections to authenticity of summary judgment evidence are waived if not timely raised). Indeed, the Debtor also relies upon portions of transcripts that are not properly authenticated.

[3] It is unknown from the record how Bates was able to arrive home ahead of Gex.

6.     On or about March 8, 2007, the Debtor purportedly executed a promissory note in which she agreed to pay Hancock Bank $35,055, together with interest at the rate of ten (10%) percent, in 36 installments of $1,131.48, beginning on April 8, 2007, with the final payment due on March 8, 2010.  (Ex. 1, Adv. Dkt. No. 24).

7.     No employee at Hancock Bank spoke with the Debtor about the loan or witnessed her sign the promissory note or any of the other loan documents.  (Garcia Exam. at 9, Leyser Exam. at 34, Gex Exam. at 13, Adv. Dkt. No. 40; Debtor Exam. at 66-68, Adv. Dkt. No. 22).  Hancock Bank's actions in this regard were not typical for the bank and violated its own banking standards.  (Gex Exam. at 12-13, Adv. Dkt. No. 35).

8.     Bates forged the Debtor's name on the promissory note.  (Debtor Exam. at 24-25, Adv. Dkt. No. 24).  The Debtor never authorized Bates to sign her name.  (Debtor Exam. at 35-35, Adv. Dkt. No. 24).  Bates admits in Bates Response to Rule 7056 Motion Against Bates that he, not the Debtor, owes the balance due on the loan.  (Bates Resp. ¶ IX, Adv. Dkt. No. 36).

9.     Bates executed a Consumer Security Agreement pledging as collateral for the loan two (2) motor vehicles: a 2003 Chevrolet Pickup and a 2004 Acura.[4]  (Ex. 2, Adv. Dkt. No. 24).  The Debtor's signature also appears on the Consumer Security Agreement.  (Ex. 2, Adv. Dkt. No. 24).  The agreement prevented Bates from selling or otherwise disposing of the collateral without Hancock Bank's prior written consent until the loan was paid in full.  (Ex. 2, Adv. Dkt. No. 24).

10.     Hancock Bank perfected its security interest in the two vehicles, as evidenced by certificates of title issued by the State of Mississippi, which indicate that as of March 8, 2007,

---

[4] The Debtor testified that her children owned the cars but the certificates of title show Bates as the owner.  (Debtor Exam. at 35-37, Adv. Dkt. No. 22).  This factual dispute is immaterial to the issues presented in the motions *sub judice*.

Hancock Bank was the first and only lienholder.[5]  (Ex. 3, Adv. Dkt. No. 24).

      11.      On or about March 8, 2007, Hancock Bank received a Disbursement Request and Authorization purportedly signed by the Debtor, directing Hancock Bank to disburse all of the loan proceeds directly to the Debtor.  (Ex. 4, Adv. Dkt. No. 24).

      12.      On March 9, 2007, Hancock Bank issued a check made payable to "Cheryl Bates" in the amount of $35,000. (Ex. 5, Adv. Dkt. No. 24).  That same day, Bates forged the Debtor's endorsement on the back of the check.[6]  (Debtor Exam. at 44 & Ex. 5, Adv. Dkt. No. 24).

      13.      Bates deposited the check into his business account, "Chuck Bates Wholesale," at The Peoples Bank.  (Ex. 5, Adv. Dkt. No. 24).

      14.      The Debtor did not receive any benefit from the loan transaction, although Bates occasionally gave her small sums of money with which to pay monthly bills.  (Debtor Exam. at 44-47, Adv. Dkt. No. 24).

      15.      Bates "transferred, sold and disposed of" both motor vehicles that secured the loan. (Bates Answer to Compl. ¶ LIV, Adv. Dkt. No. 9).

      16.      The Debtor first became aware of the loan transaction some time in May, 2007. (Debtor Exam. at 24-25, Adv. Dkt. No. 24).  When she confronted Bates, he became distraught and told her he would make arrangements to refinance the loan from her name to his father's name. (Debtor Exam. at 35-37, 49-50, Adv. Dkt. No. 24).

      17.      The Debtor thereafter met with an attorney to discuss her liability on the note.

---

    [5] See Motor Vehicle Titles Law, Miss. Code Ann. § 63-21-43(2) (governing the perfection of security interests in motor vehicles).

    [6] The record does not indicate how Bates obtained possession of the check.

(Debtor Exam. at 70-71, Adv. Dkt. No. 24).  The Debtor understood from her meeting with the attorney that if she informed Hancock Bank of the forgeries, Bates, Leyser, and Gex would all "get in trouble."  (Debtor Exam. at 70-71, Adv. Dkt. No. 24).

18.     On May 15, 2007, and again on June 13, 2007, the Debtor issued a check made payable to Hancock Bank from her personal checking account, each in the amount of $1,131.48. (Exs. 6-7,  Adv. Dkt. No. 24).  The Debtor made these two payments on the loan because she was concerned that Bates would receive a jail sentence for the forgeries, because she thought their friends Leyser and Gex would lose their jobs at Hancock Bank, and because she believed that Bates was going to refinance the loan.  (Debtor Exam. at 35-37, 49-50, Adv. Dkt. No. 24).

19.     The Debtor made no additional payments on the loan until December 12, 2007.  (Ex. 8, Adv. Dkt. No. 24).  In the meantime, the loan became delinquent.  (Adv. Dkt. No. 40).  Leyser contacted Bates regarding payment on the loan but never discussed the delinquency directly with the Debtor.  (Leyser Exam. at 18, Adv. Dkt. No. 40).

20.     During this period of time, Hancock Bank became aware that Bates had sold the two vehicles pledged as collateral on the loan.  (Bates Resp. to Rule 7056 Mot. Against Bates ¶ X, Adv. Dkt. No. 36; Leyser Exam at 18-20, Adv. Dkt. No. 35).  According to Bates, Hancock Bank knew about the disposition of the vehicles and informed him that their presence as collateral on the loan was unimportant so long as payments continued to be made.  (Bates Resp. to Rule 7056 Mot. Against Bates ¶ X, Adv. Dkt. No. 36; Leyser Exam. at 18-20, Adv. Dkt. No. 35).

21.     The Debtor made five additional payments on the loan from December 12, 2007, through August 7, 2008.  (Ex. 8, Adv. Dkt. No. 24).  The dates and amounts of these payments are as follows:

| | |
|---|---|
| 12/17/07 | $1,131.48 |
| 04/08/08 | $1,131.48 |

| | |
|---|---|
| 05/12/08 | $1,132.00 |
| 06/06/08 | $1,131.48 |
| 08/07/08 | $1,131.48 |

(Ex. 8, Adv. Dkt. No. 24).

22. Hancock Bank began entering debits to the Debtor's checking account in January, 2008, to make note payments. (Ex. 8, Adv. Dkt. No. 24). The dates and amounts of these debits are as follows:

| | |
|---|---|
| 01/31/08 | $1,131.48 |
| 07/09/08 | $1,131.48 |
| 09/12/08 | $1,131.48 |
| 10/13/08 | $1,131.48 |
| 11/10/08 | $1,131.48 |
| 12/10/08 | $1,131.48 |
| 01/30/09 | $1,131.48 |
| 04/28/09 | $1,490.65 |

(Ex. 8, Adv. Dkt. No. 24).

23. Bates obtained a Payment Deferral Amendment form from Hancock Bank and presented it to the Debtor for her signature. (Debtor Exam. at 49-50, Adv. Dkt. No. 24). The Debtor herself signed the form on February 6, 2009, requesting that Hancock Bank defer payments on the note for 30 days. (Ex. 9, Adv. Dkt. No. 24). According to the Debtor, Bates told her that Leyser suggested the deferral in order to allow Hancock Bank sufficient time to refinance the loan. (Debtor Exam. at 49-50, Adv. Dkt. No. 24).

24. The balance due on the note as of November 19, 2009, was $16,152.24.[7] (Aff. of Moulder, Ex. 13, Adv. Dkt. No. 24).

25. On June 23, 2009, the Debtor filed a voluntary petition for relief under chapter 7 of

[7] The balance on the loan suggests that payments were made on the loan in addition to those made by the Debtor and those debited from her account at Hancock Bank. It is unknown, for example, what payments Bates himself may have made on the loan.

the United States Bankruptcy Code. (Case No. 09-51279, Dkt. No. 1). As required by 11 U.S.C. § 521(a)(1), the Debtor filed a schedule of assets and liabilities and a statement of financial affairs together with her petition. (Case No. 09-51279, Dkt. No. 2).

26.     In Schedule B (Personal Property), the Debtor did not list any claim against Hancock Bank under Item 21 of Official Form 6, which instructed her to describe any "other contingent and unliquidated claims of every nature, including . . . counterclaims of the debtor, and rights to setoff claims." (Case No. 09-51279, Dkt. No. 2).

27.     In Schedule F (Creditors Holding Unsecured Non Priority Claims), the Debtor identified the loan as a debt she owed to Hancock Bank and did not identify the loan as contingent, unliquidated, or disputed. (Case No. 09-51279, Dkt. No. 2).

28.     In Schedule H (Codebtors), the Debtor indicated that no one else was liable on any of the debts listed in her schedules. She did not identify Bates as a co-debtor on the loan from Hancock Bank. (Case No. 09-51279, Dkt. No. 2).

29.     On July 30, 2009, this Court entered an order requiring the Debtor to submit to a Bankruptcy Rule 2004 examination by Hancock Bank and to produce certain financial documents relevant to her examination. (Case No. 09-51279, Dkt. No. 18).

30.     On August 18, 2009, the Debtor submitted to an examination of creditors as required by 11 U.S.C. § 341. (§ 341 Mtg. at 3-4). She testified at the § 341 meeting that she had no claims of any kind. (§ 341 Mtg. at 3-4). She also testified that she did not sign the loan documents. (§ 341 Mtg. at 7-10).

31.     On October 21, 2009, the Debtor appeared with her counsel for her Rule 2004 examination, at which time she informed Hancock Bank that she had known since May 2007 that

her husband had forged her signature on the loan documents.  (Debtor Exam. at 24-25; Adv. Dkt. No. 24).

32.     On November 19, 2009, Hancock Bank filed a Complaint (the "Complaint") (Adv. Dkt. No. 1) against the Debtor and Bates in this Adversary.  In its Complaint, Hancock Bank seeks a judgment against the Debtor for the amount due on the loan ($16,152.24) on the ground that she ratified the actions of her husband Bates (Count I) or, in the alternative, that she is estopped from denying the validity of the loan (Count II). (Compl. ¶¶ 24-25, 27-28, Adv. Dkt. No. 1).  Hancock Bank also seeks a determination by this Court that the debt the Debtor owes to Hancock Bank is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) (Count III) and under 11 U.S.C. § 523(a)(6) (Count IV). (Compl. ¶¶ 31, 34, Adv. Dkt. No.1).  Hancock Bank asserts claims of misrepresentation and fraud (Count V) and conversion (Count VI) against Bates arising out of the forged loan documents and his disposal of the two vehicles pledged as collateral on the loan. (Compl. ¶¶ 36-37, 39-40, Adv. Dkt. No. 1).  Hancock Bank also seeks a judgment declaring that the Debtor is prohibited by the doctrine of judicial estoppel from bringing any cause of action against Hancock Bank (Count VII & VIII).  (Compl. ¶¶ 42-46, Adv. Dkt. No. 1).   Hancock Bank seeks punitive damages in the amount of at least $50,000 (Count IX) and attorney's fees (Count X) against both the Debtor and Bates.  (Compl. ¶¶ 47-48, 50-55, Adv. Dkt. No.1).

33.     On December 8, 2009, the Debtor amended Schedule B to add a claim against Hancock Bank for an amount in excess of $500,000. (Case No. 09-51279, Dkt. No. 36).

34.     On December 21, 2009, the Debtor filed Defendant, Cheryl R. Bates' Answer to the Complaint (the "Debtor Answer to Complaint") (Adv. Dkt. No. 8), which included a Counter and Third-Party Complaint (the "Counterclaim and Third-Party Complaint") (Adv. Dkt. No. 8) against

Hancock Bank, Leyser, and Gex alleging breach of fiduciary duty (Count One), negligence *per se* based upon violations of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. §§ 6801 *et seq*. and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq*. (Count Two), misrepresentation and fraud (Count Three), conversion (Count Four), and civil conspiracy (Count Five). (Countercl. & Third-Party Compl. ¶¶ 10-14, Adv. Dkt. No. 8). The Debtor seeks monetary sanctions under Rule 9011(b)(1) and (3) of the Federal Rules of Bankruptcy Procedure, recovery of costs and attorney's fees under 11 U.S.C. § 523(d), actual and compensatory damages in the amount of $50,000, and punitive damages in the amount of $1 million. (Countercl. & Third-Party Compl. ¶¶ 16-17, Adv. Dkt. No. 8).

**Discussion**

Hancock Bank alleges that the Debtor knowingly participated in her husband's fraudulent scheme against the bank; the Debtor alleges that Hancock Bank, Leyser, and Gex actively participated in her husband's fraudulent scheme against her. This Adversary is the result of the diametrically conflicting views of the parties regarding the extent, if any, that each contributed to the losses they suffered as a result of the fraudulent loan. The question presented for decision by the Rule 7056 Motion Against Debtor is whether the Debtor is liable for payment on the loan as a matter of law notwithstanding Bates's forgery of her name on the loan documents. The Rule 7056 Motion Against Bates presents the question whether Bates is liable for conversion of the collateral securing the loan as a matter of law. Hancock Bank styled both the Rule 7056 Motion Against Debtor and the Rule 7056 Motion Against Bates as "partial" because it does not seek summary judgment as to its claim against the Debtor that her debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(6), or as to its claims against Bates for misrepresentation and fraud, or as to its

claims against both the Debtor and Bates for punitive damages and attorney's fees. The question presented for decision by the Motion to Dismiss requires this Court to determine the viability of the Debtor's claims against Hancock Bank, Leyser, and Gex.

**A. Legal Standard–Summary Judgment**

Pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure, the familiar summary judgment standard established under Federal Rule of Civil Procedure 56 applies in bankruptcy cases. Summary judgment is appropriate when under Rule 56(c) viewing the evidence in the light most favorable to the nonmoving party, the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Defense of a proper summary judgment motion requires more from the non-moving party than the mere allegation or denials of his pleadings. Rule 56(e)(2) provides, in relevant part:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.

Fed. R. Civ. P. 56(e)(2). Thus, once the moving party has made its required showing, the non-moving party must go beyond the pleadings and by its own affidavits or by depositions, answers to interrogatories, and admissions on file designate specific facts to establish that there is a genuine issue for trial. Celotex, 477 U.S. at 324. Simply put, the non-moving party must bring forward "significant probative evidence" demonstrating the existence of a triable issue of fact." Munitrad Sys. Inc. v. Standard & Poor's Corp. (In re Municipal Bond Reporting Antitrust Lit.), 672 F.2d 436,

440 (5th Cir. 1982). Ultimately, the role of this Court is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see Hamilton v. Segue Software Inc., 232 F.3d 473, 477 (5th Cir. 2000).

**B.    Hancock Bank's Rule 7056 Motion for Partial Summary Judgment as to Cheryl R. Bates**

Hancock Bank asks this Court to enter judgment declaring that the Debtor (1) ratified the actions of her husband Bates and (2) is estopped from denying the validity of the promissory note.[8] Before addressing the merits of Hancock Bank's contentions, however, it is first necessary to discuss the interplay between provisions of the Uniform Commercial Code (UCC),[9] specifically those provisions that pertain to forgeries and common-law principles of agency and equity. Two sections in Article 1 of the UCC set forth the principles to be applied in determining whether the UCC displaces non-UCC law on a claim. The first of these, § 1-102, states: "This code shall be liberally construed and applied to promote its underlying purposes and policies." § 1-102(1). The purposes and policies are "(a) to simplify, clarify and modernize the law governing commercial transactions; (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; [and] (c) to make uniform the law among the various jurisdictions." § 1-102(2)(a)-(c). The second section, § 1-103, states: "Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentations, duress, coercion, mistake, bankruptcy, or

---

[8] Hancock Bank also asks this Court to apply the doctrine of judicial estoppel, an argument that is addressed later in this opinion.

[9] Hereinafter, all references to the UCC are to the Mississippi Uniform Commercial Code, located in Title 75 of the Mississippi Code Annotated beginning with Miss. Code Ann. § 75-1-101. Further citations to the UCC will omit the reference to Title 75.

other validating or invalidating cause shall supplement its provisions." § 1-103. The official comment explains that this section "indicates the continued applicability to commercial contracts of all supplemental bodies of law except insofar as they are explicitly displaced by this Act . . . ." Official Comment No. 1 to § 1-103.

The specific provisions regarding negotiable instruments are found in Article 3 of the UCC. A "negotiable instrument" is "an unconditional promise or order to pay a fixed amount of money, with or without interest . . . if it: (1) [i]s payable to bearer or to order at the time it is issued or first comes into possession of a holder; (2) [i]s payable on demand or at a definite time; and (3) [d]oes not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money . . . ." . § 3-104(a)(1)-(3). The promissory note and check clearly qualify as "negotiable instruments." Jordan v, BancorpSouth Bank, 964 So. 2d 1205, 1207 (Miss. Ct. App. 2007). When the promissory note was signed and the check endorsed, the rights and responsibilities of Hancock Bank became governed by reference to the UCC and to those provisions of the common law that are consistent with the policies and purposes of the UCC. Hancock Bank's efforts to enforce the loan against the Debtor are grounded upon the doctrine of ratification, as codified in § 3-403, and the common-law principle of equitable estoppel, as retained in § 1-103.

**1. Ratification**

Under the UCC, an unauthorized signature, as a general rule, binds the person who signed the instrument rather than the person whose name appears on the document. § 3-403(a). The UCC defines an unauthorized signature as a signature "made without actual, implied or apparent authority and includes a forgery." § 1-201(43). Mississippi has interpreted "unauthorized" and "forgery" as interchangeable terms. Delta Chem. & Petroleum, Inc. v. Citizens Bank, 790 So. 2d 862, 870-71

(Miss. Ct. App. 2001).  Here, it is undisputed that the Debtor's signature was forged on the promissory note.  Hancock Bank, however,  insists that the Debtor is liable on the note by virtue of an exception found in § 3-403(a), which states:

> Unless otherwise provided in this chapter or Chapter 4, an unauthorized signature is ineffective except as the signature of the unauthorized signer in favor of a person who in good faith pays the instrument or takes it for value. *An unauthorized signature may be ratified for all purposes of this chapter.*

Id. (emphasis added).  If the Debtor did ratify the forgery as Hancock Bank claims, then she is liable on the note just as if she had authorized her husband Bates to sign her name, at least insofar as her liability to Hancock Bank is concerned.[10]

Whether there has been a ratification of an unauthorized signature is often a question of fact and, thus, not usually fodder for summary judgment.   Hancock Bank nonetheless contends that no material issue of fact exists as to whether the Debtor ratified the note.

The term "ratification" is not defined in the UCC; however, courts have almost uniformly looked to the law of agency when interpreting § 3-403 for "[t]he meaning of ratification for purposes of negotiable instruments law is not dissimilar from its general meaning in the law of agency." Thermo Contracting Corp. v. Bank of New Jersey, 354 A.2d 291, 295 (N.J. 1976);[11] see also Delta Chem., 790 So. 2d at 871-75.  Under Mississippi law, ratification is "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby

---

[10] Ratification, however, would not affect any rights the Debtor may have against her husband for forging her name and would not alter Bates's criminal liability, if any. § 3-403(c).

[11] In keeping with one of the express purposes of the UCC—"to make uniform the law among the various jurisdictions"—Mississippi courts afford great deference to decisions reached by their sister jurisdictions.  Bay Springs Forest Prods., Inc. v. Wade, 435 So. 2d 690, 695 (Miss. 1983).

the act, as to some or all persons is given affect as if originally authorized by him." Gulf Ref. Co. v. Travis, 30 So. 2d 398, 399-400 (Miss. 1947). "[A] person may ratify his unauthorized signature if he knowingly assents to it by express statement or conduct (such as retaining benefits accruing from the signature), and he may be precluded from denying it not only by estoppel but also by negligence in permitting or failing to disavow it." European Am. Bank & Trust Co. v. Starcrete Int'l Indus., Inc., 613 F.2d 564, 566-67 (5th Cir. 1980). Moreover, "[a]cquiesence or silence may also constitute ratification." Common Wealth Insur. Sys., Inc. v. Kersten, 115 Cal. Rptr. 653, 661 (1974). In Mississippi, in order to establish ratification and prevail at the summary judgment stage, Hancock Bank must demonstrate that the Debtor intended to ratify the forgeries and that at the time of the ratification, the Debtor had full knowledge of the materials facts of the loan transaction. Polles v. FDIC, 749 F. Supp. 136, 141-42 (N.D. Miss. 1990).

As noted previously, Hancock Bank contends that the Debtor's conduct following the forgeries establish ratification as a matter of law. These actions and/or inactions include the following: (1) the Debtor learned about the forgeries sometime in May, 2007, three months after the loan transaction, but did not inform Hancock Bank until the § 341 meeting of creditors took place, more than two years later on August 18, 2009. (§ 341 Mtg at 7-10, Adv. Dkt. 24); (2) the Debtor retained an attorney to discuss her personal liability on the note and decided then not to inform Hancock Bank of the forgeries (Debtor Exam. at 70-71, Adv. Dkt. No. 24); (3) the Debtor made several payments on the loan from her personal checking account (Debtor Exam. at 24-25, Adv. Dkt. No. 24); and (4) the Debtor signed a Payment Deferral Amendment, requesting that Hancock Bank defer payment on the loan for thirty days. (Debtor Exam at 49-50, Ex. 9, Adv. Dkt. No. 24). Predictably, the Debtor contends that she did not have the intent to ratify or the full knowledge of

the material facts required for ratification.  Notably, Bates supports the Debtor's version of the events

by denying in his Answer to Complaint (the "Bates Answer to Complaint") (Adv. Dkt. No. 9) that

she ratified the forgeries.  (Bates Answer to Compl. ¶ XXXIX, Adv. Dkt. No. 9).

       Hancock Bank recognizes in its Brief in Support of Rule 7056 Motion Against Debtor that

the mere delay of time in not informing a bank that a signature on an instrument is forged does not

in itself establish ratification.  (Br. in Supp. of Rule 7056 Mot. Against Debtor at 20, Adv. Dkt. No.

25).  Silence may imply ratification only if there are other factors to show that the silence indicates

an actual intention to ratify.  See Stella v. Dean Witter Reynolds, Inc., 574 A.2d 468 (N.J. 1990).

Indeed, as noted in an analogous case, Atlas Bldg. Supply Co. v. First Indep. Bank of Vancouver,

550 P.2d 26 (Wash. 1976), efforts to seek restitution against the forger suggest the opposite of an

intent to ratify.  For this reason, the court in Cook v. Great W. Bank & Trust, 685 P.2d 145, 150

(Ariz. 1984), held that a summary judgment was not proper where evidence of an implied ratification

consisted of a ten-month delay in reporting the forgery while the person whose name was forged took

action to recover the proceeds from the alleged forger.

       It is worth noting that in those cases in which a court has found ratification established as a

matter of law, the evidence clearly showed when the plaintiff learned of the unauthorized signature

and what actions the plaintiff took once the discovery was made.  For example, in Polles, evidence

of a husband's two-and-one-half-year delay in reporting the unauthorized endorsement on a check,

forged either by his wife or brother-in-law, was found to be insufficient to cause ratification as a

matter of law in the absence of additional evidence as to when the husband first learned of the

forgery and what specific actions he took to recover the funds.  Polles, 749 F. Supp. at 142.

       Here, there is evidence in addition to the delay itself that raises the inference of ratification.

According to the Debtor, however, her multiple payments on the note and her request to defer payment on the loan were measures she took to protect her husband and their friends, Leyser and Gex, and also to maintain the status quo until such time as her husband could refinance the loan out of her name. The Debtor's explanation raises the question whether her conduct was truly voluntary, indicating her desire to be bound on the note, or whether her actions were the result of duress or misrepresentation. There is evidence in the record that Bates obtained the fraudulent loan only after the Debtor had refused to co-sign a loan for him. Bates himself supports his wife's position that she never intended to ratify the loan. These facts would present a closer question of ratification if there were any evidence in the record that the Debtor accepted any substantial benefit from the loan, such as, for example, if any of the proceeds had been deposited into the Debtor's account at Hancock Bank rather than into Bates's business account at The Peoples Bank. In the absence of evidence that the Debtor received any such direct benefit, there exist genuine issues of material fact that prevent a finding of tacit ratification as a matter of law. Consequently, Hancock Bank is not entitled to summary judgment.

**2. Estoppel**

As alternative grounds for its summary judgment motion against the Debtor, Hancock Bank contends that the Debtor is equitably estopped from denying the validity of the loan because the bank reasonably relied upon her failure to report her husband's fraud. Stated another way, Hancock Bank contends that the Debtor's silence lulled the bank into a false sense of security into believing that the signature on the loan was hers. According to Hancock Bank, if the Debtor had reported the forgery, either it would not have loaned the money or it would have acted sooner to recover the funds loaned as well as the motor vehicles before Bates sold them.

Hancock Bank blends its discussion of ratification with the principle of equitable estoppel. Equitable estoppel, however, differs from ratification in that equitable estoppel results from the inducement to another to act to his prejudice, whereas ratification arises out of confirmation after conduct.  Gulf Ref. Co., 30 So. 2d at 399.  The distinction between being bound through ratification and being bound by an estoppel is that in the former case, the party is bound because he intended to be; in the latter he is bound notwithstanding the absence of any such intention, but because the other party will be prejudiced by his conduct unless the law treats him as legally bound.  Id. at 399-400.

The Mississippi Supreme Court has described equitable estoppel "as the principle by which a party is precluded from denying any material fact, induced by his words or conduct upon which a person relied, whereby the person changed his position in such a way that injury would be suffered if such denial or contrary assertion was allowed."  Dubard v. Biloxi H.M.A., Inc., 778 So. 2d 113, 114 (Miss. 2000) (citation omitted).   The elements of equitable estoppel *by silence* in Mississippi are: (1) that the party had a duty to speak, (2) that his failure to speak was either intentional or in negligent disregard of plain dictates of conscience and justice, and (3) that the other party relied on the fact of silence to his detriment.  Hohenberg Bros. Co. v. Killebrew, 505 F.2d 643, 646 (5th Cir. 1975).

Hancock Bank has not shown sufficient evidence to support the essential elements of its equitable estoppel defense.  Specifically, Hancock Bank has not shown that it suffered any prejudice as a result of the Debtor's silence. The Debtor did not know about the loan until a few months after Hancock Bank had disbursed the loan proceeds and, therefore, could not have prevented the money from being loaned in the first place.  See Suggs v. Town of Caledonia, 470 So. 2d 1055, 1058 (Miss. 1985) (application of the doctrine of estoppel requires that the party to be estopped have knowledge

of the situation). Also, Hancock Bank's bare assertion that it could have recovered some of the loan proceeds if the Debtor had only informed it of the forgery earlier is farfetched, given that all of the loan proceeds were disbursed before the Debtor discovered the forgery. See Resolute Ins. Co. v. State, 290 So. 2d 599 (Miss. 1974) (estoppel presupposes that party had an opportunity to speak out). This is not a situation where a bank opened a line of credit that was depleted by forged draw requests over a long period of time. Cf. Parish Nat'l Bank v. Ott, 841 So. 2d 749, (La. 2003) (holding husband liable for those draw requests forged by his wife after he became aware of problem). Finally, whether Hancock Bank could have recovered its collateral before Bates disposed of the vehicles is an assertion without any supporting evidence in the record. It is unknown, for example, when or how Bates disposed of the vehicles.

Hancock Bank has failed to show at this stage of the proceedings the absence of material and disputed facts as to whether it suffered prejudice as a result of the Debtor's silence. Also, there are other factual issues that preclude summary judgment, such as whether Hancock Bank acted reasonably in relying on the Debtor's silence given these circumstances where the bank did not conform with its own standard procedures in processing the loan. For these reasons, Hancock Bank is not entitled to summary judgment.

**C. Hancock Bank's Rule 7056 Motion for Partial Summary Judgment as to Charles R. Bates**

Hancock Bank seeks summary judgment against Bates in the amount of $16,152.24, plus interest, costs, expenses, and attorney's fees, for conversion of the collateral that Bates pledged as

security for the loan.[12] As grounds for the judgment, Hancock Bank relies upon Bates's admission in Bates Answer to Complaint that he "granted a security interest in a 2003 Chevrolet pickup and a 2004 Acura to Hancock Bank and later transferred, sold and disposed of the collateral." (Bates Answer to Compl. ¶ LIV, Adv. Dkt. No. 9). This admission, according to Hancock Bank, establishes as a matter of law that Bates "has exercised dominion or control inconsistent with and in exclusion or defiance to the rights of Hancock [Bank] . . . and has done so willingly and/or maliciously." (Br. in Supp. of Rule 7056 Mot. Against Bates, Adv. Dkt. No. 28). Bates, on the other hand, contends that Hancock Bank was aware that he had transferred and sold the vehicles long before initiating this Adversary but took no action in response. (Bates Resp. to Rule 7056 Mot. Against Bates ¶ X, Adv. Dkt. No. 36). Moreover, Hancock Bank represented that the presence of the collateral was unimportant to the loan as long as the debt continued to be paid. (Bates Resp. to Rule 7056 Mot. Against Bates ¶ X, Adv. Dkt. No. 36).

Under Mississippi law, a wrongful conversion occurs when a party improperly takes possession of another's property or exercises domination in defiance of an owner's right to wrongfully retains possession over property after demand. Wilson v. GMAC, 883 So. 2d 56, 68-69 (Miss. 2004). Although conversion requires an intentional act, the required intent does not have to be the "intent to be a wrongdoer." Terrell v. Tschirn, 656 So. 2d 1150, 1153 (Miss. 1995).

Chapter 9 of the UCC applies to a transaction that creates a security interest in personal

[12] A forgery renders the forger liable just as if he had signed his own name except where there has been a ratification by the person whose name he forged. § 3-403. Because Hancock Bank has taken the position that the Debtor ratified her forged signature, it does not attempt to hold Bates liable on the note, although Bates admits that he is responsible for payment of the balance due on the loan. (Bates Resp. to Rule 7056 Mot. Against Bates ¶ IX, Adv. Dkt. No. 36).

property.[13] Under § 9-315 of the UCC, a security interest continues in collateral notwithstanding its sale or other disposition unless the secured party authorized the disposition free of the security interest. Bates did not offer any proof in support of his assertion that Hancock Bank knew of and acquiesced in the sale of the motor vehicles. To defend against a summary judgment motion, a non-moving party may not rely on unsworn allegations or arguments in pleadings or briefs. Fed. R. Civ. P. 56(e). Even if Bates could show by proper summary judgment evidence that Hancock Bank knew about the sale and did not object right away, its knowledge alone would not necessarily operate as a waiver of its rights to insist upon compliance with the provision of the Consumer Security Agreement requiring prior written consent. See, e.g., Erlandson Implement, Inc. v. First State Bank of Brownsdale, 400 N.W.2d 421, 425 (Minn. Ct. App. 1987) (bank's knowledge of its customer's disposition of collateral did not necessarily constitute waiver of its rights under the security agreement). Since the record does not indicate the existence of a factual dispute about whether Hancock Bank authorized the sale, there is no evidence supporting Bates's claim that Hancock Bank waived its security interest in the automobiles. Hancock Bank, therefore, is entitled to summary judgment against Bates on its conversion claim.

Hancock Bank seeks the balance due on the loan as its amount of damages for conversion of its collateral, however, the appropriate measure of damages for conversion requires a finding with respect to the fair market value of the two motor vehicles at the time and place of their conversion. Wilson, 883 So. 2d at 69. There is no evidence in the record indicating the fair market value or the amount received by Bates from the sale of these two vehicles. Thus, Hancock Bank has failed to

[13] Because the Consumer Security Agreement is "a transaction . . . that creates a security interest in personal property . . . by contract," it falls within the ambit of Article 9 of the UCC. § 9-109(a)(1).

present sufficient evidence as to the amount of damages, and summary judgment is inappropriate on the damage issue.

**D. Legal Standard–Rule 12(b)(6)**

To defeat a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), which is made applicable to bankruptcy cases by Rule 7012 of the Federal Rules of Bankruptcy Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Recently, in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), the Supreme Court described application of the "plausibility" standard in Twombly as a two-part analysis. First, a court should begin by identifying those allegations in the complaint that, unlike non-conclusory, factual allegations, are not entitled to the assumption of truth. Iqbal, 129 S. Ct. 15 1949-50. A pleading that includes "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Second, a court should determine whether the non-conclusory factual allegations in the complaint plausibly suggest a claim for relief. Iqbal, 129 S. Ct. at 1950.

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true (even if doubtful in fact) and view them in the light most favorable to the plaintiff. Twombly, 550 U.S. at 555. Moreover, in ruling on such a motion, the court cannot look beyond the pleadings. Sonnier v. State Farm Mut. Auto. Ins. Co., 509 F.3d 673, 675 (5th Cir. 2007). The pleadings include the complaint and any documents attached to it. Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000). Likewise, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims." Id. (quoting Venture Assocs. Corp. v. Zenith

Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993)).

When a movant submits matters outside the pleadings along with its motion to dismiss, the court must convert a motion to dismiss into a motion for summary judgment. Bolen v. Dengel (In re Dengel), 340 F.3d 300, 312 (5th Cir. 2003). Because there have been matters submitted outside the pleadings, this Court will construe Hancock Bank's Motion to Dismiss as a summary judgment motion, subject to the same standard previously discussed in this opinion.

**E. Motion to Dismiss Counterclaim and Third-Party Complaint**

The Debtor asserts in her Counterclaim and Third-Party Complaint a panoply of claims against Hancock Bank, Leyser, and Gex[14] under theories outside the UCC, with the exception of her conversion claim. See § 3-420. None of the parties, however, discussed the extent that the UCC displaces these other non-UCC claims. See, e.g., Berhow v. The Peoples Bank, 423 F. Supp. 2d 562 (S.D. Miss. 2006) (UCC limited negligence claims of bank customer who was victim of fraud by loan officer); Hancock Bank v. Ensenat, 819 So. 2d 3 (Miss. Ct. App. 2001) (Mississippi UCC determined rights and responsibilities of parties). This Court, therefore, will address the Debtor's claims as though they have not been displaced. Judwin Props., Inc. v. U.S. Fire Ins. Co., 973 F.2d 432, 436-37 (5th Cir. 1992) (court may not grant summary judgment on a ground not raised in the motion without prior notice to non-movant).

**1. Judicial Estoppel**

Courts in numerous cases have judicially estopped a debtor who failed to disclose a claim in his bankruptcy schedules from later pursuing that same claim post-bankruptcy. Hancock Bank

[14] For ease of reference, this Court will refer to Hancock Bank, Leyser, and Gex as simply Hancock Bank when discussing the legal arguments of the respective parties.

claims that the Debtor likewise is judicially estopped from pursuing any of her alleged counterclaims or defenses against Hancock Bank. Judicial estoppel "is a common law doctrine that prevents a party from assuming inconsistent positions in litigation." In re Superior Crewboats, Inc., 374 F.3d 330, 334 (5th Cir. 2004).[15] The purpose of the doctrine is to protect the integrity of the judicial process by preventing parties, metaphorically speaking, from "playing fast and loose with the courts." Id. "[W]here a party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." Davis v. Wakelee, 156 U.S. 680, 689 (1895). There are three requirements for application of the judicial estoppel doctrine: "(1) the party is judicially estopped only if its position is clearly inconsistent with the previous one; (2) the court must have accepted the previous position; and (3) the non-disclosure must not have been inadvertent." Superior Crewboats, 374 F.3d at 335. The record does not support a finding that the second and third elements have been met.

With regard to the first element–whether the Debtor's current position is clearly inconsistent with her previous one–"the Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, *including contingent and unliquidated claims*." Coastal Plains, 179 F.3d at 205 (emphasis in original) (citing 11 U.S.C. § 521(1)). This duty is a continuing one and is crucial to the effective functioning of bankruptcy cases. Id. It is undisputed that although the Debtor listed the loan from Hancock Bank as a debt in her original schedule of liabilities, she did not identify it as being contingent, unliquidated or disputed. Thus, she did not disclose the possibility of an offset. Also, she did not disclose her claim against Hancock Bank in her original

[15] Federal law governs application of judicial estoppel in federal courts. Browning Mfg. v. Mims (In re Coastal Plains, Inc.), 179 F.3d 197, 205 (5th Cir. 1999), cert. denied, 528 U.S. 1117 (2000).

schedule of assets and her statement of financial affairs.

As noted by the Fifth Circuit, the omission of a claim from the debtor's mandatory bankruptcy filings is tantamount to a representation that no such claim existed. Superior Crewboats, 374 F.3d at 335. Moreover, at the § 341 meeting of creditors, the Debtor answered "no" to the trustee's question, "Do you think you may be entitled to sue someone for any reason?" (§ 341 Mtg. at 3-4, Adv. Dkt. No. 25).

As to the second element–whether the court accepted the previous position—the Debtor amended her schedule of assets to list a claim against Hancock Bank six months after she filed her petition and before the discharge of any of her debts. Hancock Bank contends that the trustee, creditors, and this Court all relied upon the Debtor's initial position that no claim existed. Hancock Bank, however, fails to point to any order issued by this Court demonstrating that this is so. Moreover, the purpose of judicial estoppel is to protect the judicial system–not the trustee or creditors. Coastal Plains, 179 F.3d at 205. Thus, whether Hancock Bank or any other purported creditor relied on the Debtor's no-claims-exist stance is irrelevant because detrimental reliance is not a required element of judicial estoppel. In the absence of any evidence that this Court accepted the Debtor's stance before the amendment of her schedules, Hancock Bank has failed to meet this requirement for application of the judicial estoppel doctrine.

The third element of judicial estoppel requires that the failure to disclose was not inadvertent. "[T]he debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims *or* has no motive for their concealment." Coastal Plains, 179 F.3d at 210 (emphasis in original). The Debtor contends in the Debtor Brief in Opposition to Motion to Dismiss that she "was not aware of the depth of involvement and extent of

complicity on the part of Hancock Bank" when she filed her bankruptcy petition.  Her claim against Hancock Bank came to light only after the 2004 examinations of Gex, Leyser, and Garcia.  What their testimony revealed, according to the Debtor, was that Leyser and Gex purposefully prevented her from uncovering the fraud perpetrated against her by her husband, as illustrated by their processing the loan application in a manner that was inconsistent with commercially reasonable banking standards and by their contacting Bates instead of her about the delinquent loan payments.  As to the second part of the third element, Hancock Bank has not shown what benefit the Debtor would gain in hiding her claim against Hancock Bank. She freely disclosed the existence of the loan in her schedule of liabilities and testified at her § 341 creditors' meeting, albeit reluctantly, about her husband's forgeries.

The mere fact of nondisclosure is not in itself sufficient to infer an intent to mislead or deceive the Court.  Coastal, 179 F.3d at 211. Here, the Debtor's bankruptcy case is still pending, assets have not been distributed, debts have not been discharged, and her case has not yet been closed.  There is simply no evidence that the Debtor is "playing fast and loose" with this Court to gain an unfair advantage in the adversary proceeding that was initiated, after all, by Hancock Bank.

The three cases Hancock Bank relies upon in support of judicial estoppel are inapposite.  In Coastal Plains, the Fifth Circuit held that judicial estoppel barred claims asserted post-bankruptcy where the debtor never amended its schedules to include those claims.  Likewise, the Fifth Circuit in Superior Crewboats held that the debtors' failure to disclose a $25 million pre-petition personal injury claim as an asset in their bankruptcy case in which they were granted a "no asset" discharge, judicially estopped them from pursuing that claim, notwithstanding the debtors' alleged confusion as to whether the statute of limitations had run.  In both Coastal and in Superior Crewboats, the

debtors sought to pursue claims post-bankruptcy. Finally, in In re Dewberry, 266 B.R. 916 (Bankr. S.D. Ga. 2001), the bankruptcy court did not address the issue of judicial estoppel but, rather, ruled that a debtor could reopen his bankruptcy case to amend his schedules to identify a previously undisclosed cause of action as an asset of his estate. To judicially estop the Debtor from pursuing her counterclaims against Hancock Bank under these facts at this relatively early stage of her bankruptcy case would turn the doctrine on its head.

**2. Breach of Fiduciary Duty–Count One**

Hancock Bank contends that there was no fiduciary relationship between itself and the Debtor and, thus, there can be no breach of fiduciary duty. Hancock Bank points out that there is no allegation in the Counterclaim and Third-Party Complaint to suggest that the Debtor relied upon Hancock Bank's advice or that Hancock Bank had effective control over her. To the contrary, she alleges the absence of any relationship, fiduciary or otherwise, because her husband Bates dealt exclusively with Hancock Bank regarding the loan transaction *sub judice*.

In Mississippi, a bank does not ordinarily owe a fiduciary duty to its customers because of the absence of a fiduciary relationship. Lowery v. Guar. Bank & Trust Co., 592 So. 2d 79 (Miss. 1991). Even so, it is possible for a customer to prove the existence of a fiduciary relationship with its bank in an appropriate situation. In Mississippi, a fiduciary relationship is not limited to such confined relations as trustee and beneficiary, principal and agent, guardian and ward, but arises whenever a person occupies a position out of which the duty of good faith ought in equity and good conscience to arise. Parker v. Lewis Grocer Co., 153 So. 2d 261, 275-76 (Miss. 1963). Indeed, a fiduciary relationship may encompass, in certain instances, a relationship based upon a contractual agreement.

The existence *vel non* of a fiduciary relationship is a question of fact. Lowery, 592 So. 2d at 85. "The burden of establishing the existence of a fiduciary relationship is upon the party asserting it." Mullins v. Ratcliff, 515 So. 2d 1183, 1192 (Miss. 1987). The party seeking to prove the existence of the relationship must do so by clear and convincing evidence. Id. at 1192.

In commercial transactions, a fiduciary relationship may arise when the circumstances establish that (1) the parties have "shared goals" in the other's commercial activity, (2) one party justifiably places trust or confidence in the integrity and fidelity of the other, and (3) the trusted party has effective control over the other party. Carter Equip. v. John Deere Indus. Equip., 681 F.2d 386 (5th Cir. 1982). The Debtor contends that Hancock Bank held a dominant and overreaching position, as evidenced by the number of financial transactions (other than the disputed loan), including individual and joint checking accounts, a savings account, and a car loan. Moreover, the Bates family had a personal relationship with Leyser and Gex.

Here, it is difficult to fathom the shared goal between the Debtor and Hancock Bank. None of the factors indicative of a fiduciary relationship is present in this proceeding. The Debtor has not provided any evidence that their relationship was anything more than normal prior to the loan transaction. Accordingly, the Debtor's claim for breach of fiduciary duty fails as a matter of law.

**3. Violations of Statute–Count Two**

In her Counterclaim and Third-Party Complaint, the Debtor asserts state law claims for negligence *per se* based on violations of the privacy provisions of the GLBA and the FDCPA by Hancock Bank and its employees, Leyser and Gex. In the Debtor Brief in Opposition to Motion to Dismiss, the Debtor acknowledged that FDCPA does not apply to these facts and abandoned that part

of her claim.[16] (Debtor Br. in Opp'n to Mot. to Dismiss at 21, Adv. Dkt. No. 35). Thus, the Debtor's negligence *per se* claim rests solely on the GLBA and the alleged disclosure of the Debtor's financial information to her husband Bates. Specifically, under "Count Two–Violation of Statute: Negligence Per Se," she contends that:

> Hancock and its agents and employee breached their duty under the Gramm-Leach-Bliley Act . . . by negligently revealing confidential protected information about her finances to others in the application, approval, disbursement, and collection procedures engaged in by the bank during the loan process between the bank and the third party applicant. . . . Hancock [Bank] and its agents and employees have negligently violated the Federal Trade Commission's Safeguard Rule,[17] enacted to protect the security and confidentiality of the collected personal information of . . . Cheryl R. Bates.

(Countercl. ¶ 11, Adv. Dkt. No. 8).

As a preliminary matter, it should be noted that courts consistently have recognized that no private right of action exists for an alleged violation of the GLBA. See 15 U.S.C. § 6805; Dunmire v. Morgan Stanley DW, Inc., 475 F.3d 956, 960 (8th Cir. 2007) ("[n]o private right of action exists for an alleged violation of the GLBA"); Lentz v. Bureau of Med. Econ. (In re Lentz), 405 B.R. 893, 899 (Bankr. N.D. Ohio 2009) ("courts have consistently held there is no private right of action

[16] The FDCPA subjects to civil liability debt collectors who fail to comply with its provisions. 15 U.S.C. § 1692k(a). The definition of "debt collector" in the FDCPA excludes "any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor." 15 U.S.C. § 1692a(6)(A). For that reason, Hancock Bank does not fall within the provisions of the FDCPA. See KPMG Peat Marwick v. Tex. Commerce Bank, 976 F. Supp. 623 (S.D. Tex. 1997).

[17] Congress directed the Federal Trade Commission ("FTC"), as well as other administrative agencies, to implement and enforce the provisions of the GLBA. 15 U.S.C. § 6805(a). The FTC enacted sweeping regulations, including what has become known as the Safeguards Rule, which requires financial institutions to implement security procedures that are appropriate to the institution's size and complexity. 16 C.F.R. § 314.

created by Congress in the GLBA"); French v. Am. Gen. Fin. Servs. (In re French), 401 B.R. 295, 310 (Bankr. E.D. Tenn. 2009) ("[by its very terms, the Gramm-Leach-Bliley Act does not provide a private right of action"); Briggs v. Emporia State Bank & Trust Co., No. 05-2125-JWL, 2005 WL 2035038 (D. Kan. Aug. 23, 2005) (unpublished); Borninski v. Williamson, No. Civ. A. 3:02-CV-1014, 2004 WL 433746 (N.D. Tex. Mar. 1, 2004) (unpublished). Hancock Bank, Leyser, and Gex do not dispute that the GLBA establishes a duty of care for purposes of negligence *per se*[18] but instead contend that no violation of the GLBA occurred.

The GLBA, also known as the Financial Modernization Act, was enacted "to enhance competition in the financial services industry" by allowing banks and other financial service providers to affiliate with one another and to allow those affiliated institutions to share confidential customer data. H.R. Rep. No. 106-434, at 245 (1999) (Conf. Rep.), as reprinted in 1999 U.S.C.C.A.N. 245. To allay concerns about maintaining the privacy of consumers notwithstanding the free-flow of information between merged financial service providers, the GLBA includes a privacy obligation policy, as follows: "It is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a). The GLBA prescribes how financial institutions may share customer information. It requires financial institutions to provide certain notices to its consumers, including a notice of the

[18] Under Mississippi law, to prevail in a state law action for negligence *per se*, a party must prove that she is a member of the class sought to be protected under the statute and that her injuries are of the type the statute seeks to avoid. Gallagher Bassett Servs. Inc. v. Jeffcoat, 887 So. 2d 777, 787 (Miss. 2004). For purposes of the Motion to Dismiss, this Court assumes without deciding that Mississippi would allow the GLBA to form the basis for a state law claim of negligence *per se.*

consumer's right to "opt out," that is, to elect to keep private "nonpublic personal information" from any "nonaffiliated third party." 15 U.S.C. § 6802(a)-(b).  (The GLBA does not allow a consumer to "opt out" of information sharing between affiliates.)   The GLBA defines "nonpublic personal information" ("NPI"): as information "(i) provided by a consumer to a financial institution; (ii) resulting from any transaction with the consumer or any service performed for the consumer; or (iii) otherwise obtained by the financial institution." Id. § 6809(4)(A).  A "nonaffiliated third party" is defined as "any entity that is not an affiliate of, or related by common ownership or affiliated by corporate control with, the financial institution, but does not include a joint employee of such institution." Id. § 6809(5).  Unless the appropriate notices are given and an opt-out opportunity is provided, financial institutions may not share or disclose any nonpublic personal information about a consumer to a nonaffiliated third party.  15 U.S.C. § 6802(b)(1).

The GLBA, however, lists exceptions to the rule against disclosing nonpublic personal information.   It permits financial institutions to disclose nonpublic personal information "as necessary to effect, administer, or enforce a transaction requested or authorized by the consumer . . . ." Id. § 6802(e)(1).  "Necessary to effect, administer, or enforce a transaction" means that "the disclosure is required, or is one of the lawful or appropriate methods, to enforce the rights of the financial institution. . . ." Id. § 6809(7)(B).

The Debtor insists that Hancock Bank divulged nonpublic personal information about her to her husband Bates during its efforts to collect payment on the delinquent loan.  According to the Debtor, the bank breached its duty to her by divulging the existence of the loan and its delinquency to Bates, who she describes as a "nonaffiliated third party."

Hancock Bank contends that the Debtor's claim fails because there is no identifiable breach

of duty in the GLBA for improperly disclosing nonpublic personal information to an individual, as opposed to a nonaffiliated third party. According to Hancock Bank, Bates is not a nonaffiliated third party under the GLBA because the term pertains to companies, not individuals. Hancock Bank supports its position based on the definition of an "affiliate," which refers to "any *company* that controls, is controlled by, or is under common control with another company." 15 U.S.C. § 6809(6) (emphasis added). Hancock Bank also complains that the Debtor's Counterclaim and Third-Party Complaint fails to identify the nonpublic personal information that was improperly disclosed to Bates and points out that the Debtor herself did not actually provide any information to Hancock Bank as part of the loan process.

To dispel Hancock Bank's first argument, this Court need look no further than the GLBA's definition of a "nonaffiliated third party." The definition states that it includes "any entity" but that it does not include a joint employee of the financial institution. 15 U.S.C. § 6809(5). An exclusion for a joint employee would be unnecessary if the term did not apply to individuals. Moreover, the implementing regulations define "nonaffiliated third party" specifically as "any *person*" except "your affiliate" or "a person employed jointly by you and any company that is your affiliate." 16 C.F.R.§ 313.3(m)(1)(ii) (emphasis added). Finally, if Hancock Bank's interpretation is correct–that the confidentiality provisions of the GLBA apply only to companies, than financial institutions could disclose NPI to the public at large with impunity, rendering the GLBA's privacy provisions meaningless. See Hodes v. U.S. Dep't of Housing & Urban Dev., 532 F. Supp. 2d 108, 115 (D.D.C. 2008) (rejecting argument that a "nonaffiliated third party" under the GLBA applied only to "financial institutions" for similar reasons).

Hancock Bank's second argument—that NPI includes only information provided to the

financial institution by the consumer—also conflicts with the plain language of the GLBA. The statute defines NPI as "personally identifiable financial information" ("PIFI") provided not only by a consumer but also "otherwise obtained by the financial institution." 15 U.S.C. § 6809(4)(A). Likewise, the regulations define PIFI, in part, as not only the information a consumer provides to obtain a financial product or service, but also information "about a consumer resulting from any transaction involving a financial product or service between you and a consumer or . . . [y]ou otherwise obtain about a consumer in connection with providing a financial product or service to that consumer." 16 C.F.R. § 313.3(o)(1)(ii).

In sum, Hancock Bank's interpretation of the GLBA contradicts the plain language of the statute and its implementing regulations. For this reason, it has not shown that it is entitled to summary judgment against the Debtor as a matter of law.[19]

**4. Misrepresentation and Fraud–Count Three**

The Debtor alleges in her Counterclaim and Third-Party Complaint that Hancock Bank, Leyser, and Gex made negligent and fraudulent misrepresentations when they wrongfully identified her as the loan applicant. She insists that she detrimentally relied on their false statements when she made payments on the loan. Hancock Bank contends that the Debtor's claims fail because of her own testimony that no one at Hancock Bank had any communications with her about the subject loan.

In First Money, Inc. v. Frisby, 369 So. 2d 746, 750 (Miss. 1979), the Mississippi Supreme Court first recognized negligent misrepresentation and fraudulent misrepresentation as separate causes

[19] The denial of summary judgment as to this claim does not necessarily mean that the Debtor's claim has merit. For example, if the evidence at trial shows that she ratified the loan and that Hancock Bank disclosed NPI in order to enforce its rights, then no violation of the GLBA took place. 15 U.S.C. § 6802(e)(1).

of action. The elements of a cause of action for negligent misrepresentation are: (1) a misrepresentation or omission of a fact; (2) the representation or omission is material or significant; (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance. Holland v. The Peoples Bank & Trust Co., 3 So. 3d 94, 101 (Miss. 2008). To assert a fraudulent misrepresentation claim, the following elements must be established by clear and convincing evidence: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury. Franklin v. Lovitt Equip. Co., 420 So. 2d 1370, 1373 (Miss. 1982). In addition, Rule 7009 of the Federal Rules of Bankruptcy Procedure provides that in all allegations of fraud, "the circumstances constituting fraud . . . shall be stated with particularity."

The first element necessary to establish either of these causes of action is the representation of a fact. Bank of Shaw v. Posey, 573 So. 2d 1355 (Miss. 1990). The Court agrees with Hancock Bank that the Debtor has failed to prove this first essential element because the undisputed facts show that no one at Hancock Bank made any statement to the Debtor at all about the subject loan. Indeed, the Debtor's own testimony is that she spoke to no one at Hancock Bank about the loan, not "even . . . on the phone on anything about the loan." (Debtor Exam. at 67-68; Adv. Dkt. No. 22). It is worth noting that although the Debtor alleges in her Counterclaim and Third-Party Complaint that Hancock Bank, Leyser, and Gex incorrectly identified her as the loan applicant, she does not allege that they

made this false statement *to her*. Her failure to meet this threshold requirement by clear and convincing evidence is fatal to her negligent misrepresentation and fraud claims. Therefore, Hancock Bank, Leyser, and Gex are entitled to summary judgment.

**5. Conversion–Count Four**

The Debtor alleges in her Counterclaim and Third-Party Complaint that Hancock Bank converted funds in her personal checking account when it debited loan payments. Hancock Bank argues that the Debtor's conversion claim fails as a matter of law because (1) loan payments made from the Debtor's account had been authorized and approved and (2) the common law right of setoff allowed Hancock Bank to apply funds from her account to pay on the loan. The success of both arguments by Hancock Bank depends upon whether the Debtor is bound by the loan documents, an issue that is not appropriate for summary judgment for the reasons set forth previously in this opinion.

First, Hancock Bank's assertion that the withdrawals were authorized is apparently based on certain contractual provisions of the loan documents. Hancock Bank points to the following exchange between its counsel and the Debtor when she was asked whether she knew about the debit payments at her Rule 2004 examination:

> Q But you knew these payments were coming out, either you're making them through the Internet or the bank is doing debit memos?
>
> A Right. And that's why I was like, did you—I asked him, did you sign it to where they could just take it out of my account, and he said yes.

(Debtor Exam. at 53-54; Adv. Dkt. No. 22). Although the loan documents may have authorized Hancock Bank's actions, Hancock Bank glosses over the fact that the Debtor is not bound by them unless she ratified her forged signature or is estopped from asserting the forgery.

As to Hancock Bank's second argument, if the Debtor is not liable on the fraudulent loan, then Hancock Bank had no right to setoff funds in the Debtor's personal checking account to satisfy the debt. At common law, the right of setoff arose by operation of law as a practical tool to eliminate unnecessary transactions between parties holding mutual debts. In re Braniff Airways, Inc., 42 B.R. 443, 448 (Bankr. N.D. Tex. 1984). As explained by the United States Supreme Court in Citizens Bank of Maryland v. Strumpf, 516 U.S. 16 (1995), "[t]he right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" Strumpf, 516 U.S. at 18 (citation omitted). In Mississippi, if certain conditions are met–principally mutuality and maturity–a bank has a common law right to apply a customer's deposit to payment of his debt to the bank then due and owing, without the customer's consent. Deposit Guar. Nat'l Bank v. B.N. Simrall & Son, Inc., 524 So. 2d 295, 299-300 (Miss. 1987). In Moreland v. People's Bank of Waynesboro, 74 So. 828 (Miss. 1917), the Mississippi Supreme Court explained:

> It is well settled that the bank itself has a right, if it so desires, to apply whatever amount the maker of the note has on deposit with it to a payment on the note. Or, in other words, the bank itself has the right to set off the amount it owes the depositor against the amount owed it by the depositor. The relation existing between a bank and a depositor is simply one of debtor and creditor.

Moreland, 74 So. at 829-30. The right of setoff thus exists only when there is mutuality and, in turn, mutuality exists only when the claim and the debt are due to and from the same person. Braniff Airways, Inc. v. Exxon Co., U.S.A., 814 F.2d 1030, 1036 (5th Cir. 1987). The test of mutuality does not require that the obligations be similar, only that they be owed between the same parties. When applied to deposit accounts, mutuality means that the bank must owe its customer and the same customer must owe the bank. The debts must be between the same parties and in the same "right"

or "capacity." Central Bank of Miss. v. Butler, 517 So. 2d 507, 511 (Miss. 1987).

Here, the mutuality requirement is not met unless the Debtor, rather than Bates, is liable on the loan because the checking accounts that Hancock Bank debited belonged to the Debtor, not Bates. For this reason, Hancock Bank has not established that it is entitled to summary judgment as a matter of law on the Debtor's conversion claim.

**6. Conspiracy–Count Five**

The Debtor alleges in her Counterclaim and Third-Party Complaint that Hancock Bank and its employees, Leyser and Gex, have engaged in a conspiracy "to defend Hancock Bank, stonewall the effective administration of the bankruptcy estate, impair the dischargeability of presumptive debt to Hancock Bank, and cause [the Debtor] to expend significant sums to defend the adversary Complaint." (Countercl. ¶ 14, Adv. Dkt. No. 8). Hancock Bank contends that the Debtor's allegations fail as a matter of law for the simple reason that a corporation cannot conspire with itself.

A civil conspiracy is defined as "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." Levens v. Campbell, 733 So. 2d 753 (Miss. 1999). A conspiracy claim under Mississippi law, requires the following evidence: "(1) two or more persons or corporations; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result." Gallagher, 887 So. 2d at 786. It is basic to Mississippi conspiracy law that there must be at least two persons or corporations to comprise a conspiracy. "A corporation cannot conspire with itself any more than a private individual can." Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911, 914 (5th Cir. 1952); Saucier v. Coldwell Banker JME Realty, 644 F. Supp. 2d 769 (S.D. Miss. 2007); Frye v. Am.Gen. Fin., Inc., 307 F. Supp. 2d 836, 843 (S.D. Miss. 2004). Under the intra-

corporate immunity doctrine, which is premised on the principal that a corporation and its agents are a single entity, individual agents cannot conspire with their corporate employer as a matter of law. There are two exceptions to this doctrine: the "independent personal stake" exception where "employees have an independent personal stake in achieving the object of the conspiracy," H&B Equip. Co. v. Int'l Harvester Co., 577 F.2d 239, 244 (5th Cir. 1978), and the "unauthorized acts" exception where the agents acted outside the normal course of their corporate duties.

The Debtor does not allege in her Counterclaim and Third-Party Complaint that any person, including Bates, participated in the conspiracy, other than Hancock Bank, and its employees, Leyser and Gex. She does contend in the Debtor Brief in Opposition to Motion to Dismiss, however, that Leyser and Gex had a personal stake in the object of the conspiracy, thus potentially triggering that exception to the doctrine. As evidence of this, she points to Gex's testimony that Hancock Bank "is what keeps my children fed." (Gex Exam. at 21, Adv. Dkt. No. 35). To have an "independent personal stake," however, the employee's profit must be wholly separate from the employee's connection to the corporation. See ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 179-80 (4th Cir. 2002); see also H&B Equip., 577 F.2d at 244. Additionally, an employee's stake in increased commissions does not create an "independent personal stake" in an alleged conspiracy so as to except him from the general rule. See Douty v. Irwin Mortgage Corp., 70 F. Supp. 2d 626, 633 (E.D. Va. 1999). Here, the evidence relied upon by the Debtor does not show that Gex or Leyser obtained any benefit unrelated to their employment with Hancock Bank. To apply the personal stake exception under these circumstances would eviscerate the doctrine.

The Debtor next contends that the second exception applies because Leyser and Gex were acting outside the scope of their employment with Hancock Bank when they violated Hancock

Bank's standard procedures by delivering the loan documents to Bates and by failing to witness the Debtor execute the loan documents. These acts, however, did not occur during the alleged conspiracy to disrupt her bankruptcy case, initiated by the Debtor more than two years after Gex and Leyser processed the subject loan. Thus, whether Gex and Leyser were acting within the scope of their corporate duties when they performed these acts is immaterial to the Debtor's conspiracy claim. Under the intra-corporate immunity doctrine, Hancock Bank, Leyser, and Gex are entitled to summary judgment as a matter of law.

**Conclusion**

In conclusion, Hancock Bank is not entitled to a judgment as a matter of law on its contract claim against the Debtor but is entitled to summary judgment as a matter of law on its conversion claim against Bates in an amount to be determined later at trial. The Court further concludes that Hancock Bank, Gex, and Leyser are entitled to judgment as a matter of law on the Debtor's claims for (1) breach of fiduciary duty; (2) violations of the FDCPA; (3) negligent misrepresentation and fraud; and (4) civil conspiracy. Finally, the Court concludes that Hancock Bank, Gex, and Leyser are not entitled to judgment as a matter of law on the Debtor's negligence *per se* claim under the GLBA and her conversion claim. Accordingly, the only claims that remain for trial are: (1) Hancock Bank's claim against the Debtor for nonpayment of the loan and its related claim that the Debtor's debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(6); (2) Hancock Bank's claims against Bates for misrepresentation and fraud; (3) Hancock Bank's claims against both the Debtor and Bates for punitive damages in the amount of $50,000 and attorney's fees; (4) the Debtor's privacy claim under the GLBA and her conversion claim against Hancock Bank, Leyser, and Gex in the amount of $50,000 in actual and compensatory damages; (5) the Debtor's

claims against Hancock Bank, Leyser, and Gex for monetary sanctions under Rule 9011 of the Federal Rules of Bankruptcy Procedure, for the recovery of costs and attorney's fees under 11 U.S.C. § 523(d), and for punitive damages in the amount of $1 million.

A separate final judgment will be entered in accordance with Federal Rule of Bankruptcy Procedure 9021.

SO ORDERED.

Neil P. Olack
United States Bankruptcy Judge
Dated: May 27, 2010